Filed 3/29/21  In re S.P. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re S.P., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E075722 |
| Plaintiff and Respondent, | (Super.Ct.No. RIJ2000285) |
| v. | OPINION |
| C.B., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Cheryl C. Murphy, Judge.
Affirmed.

Elizabeth C. Alexander, under appointment by the Court of Appeal, for Defendant and Appellant.

Gregory P. Priamos, County Counsel, and James E. Brown, Anna M. Marchand, and Prabhath D. Shettigar, Deputy County Counsel, for Plaintiff and Respondent.

1

I

INTRODUCTION

C.B. (Mother) appeals the juvenile court's jurisdictional and dispositional findings sustaining a dependency petition pursuant to Welfare and Institutions Code[1] section 300, subdivision (b), and removing her toddler daughter, S.P., from Mother and Father's custody.[2] Mother argues the evidence was insufficient to support the court's jurisdictional findings and the order removing S.P. from her custody. We conclude substantial evidence supports the juvenile court's findings and affirm the judgment.

II

FACTUAL AND PROCEDURAL BACKGROUND

The family came to the attention of the Riverside County Department of Public Social Services (DPSS) on May 24, 2020, when an immediate response referral was received alleging the parents had been involved in a domestic violence incident. Father was "yelling loudly, using profanity and kicking the door" of their motel room at around 3:00 a.m. for 30 to 45 minutes before Mother opened the door. The motel manager called law enforcement due to Father's violent behavior and concern for S.P., who was four months old at the time. Father's actions caused $500 worth of damages.

Father fled the scene before law enforcement arrived. Mother told law enforcement that she would reunify with Father because they did not have any problems

_____

[1] All future statutory references are to the Welfare and Institutions Code unless otherwise stated.

[2] K.P. (Father) is not a party to this appeal.

2

or issues with domestic violence. Law enforcement noted Mother had no other place to reside, no money, and was homeless. She did not exhibit signs of being under the influence, but law enforcement observed Mother with marks on her arm that may have indicated she was using drugs. Mother stated that she smoked marijuana and drank alcohol sometimes but denied using any other substances.

Mother denied any domestic violence with Father. She claimed that Father was drunk, and that Father was fine after she opened the door for him. Mother explained that she locked Father out of their room because he was drunk, and she wanted to sleep. She denied being afraid of Father. S.P. appeared adequately cared for and Mother had proper provisions for the child. Mother declined referrals to domestic violence shelters, explaining that she had stayed in a shelter and did not want to go back. DPSS paid for Mother and S.P. to stay at a different motel as she did not have the resources to do so. Mother refused to give the social worker any contact information for Father and also refused to drug test.

On May 25, 2020, the next day, when another social worker followed up with the family, an unidentified male opened the door of Mother's motel room. The man had a "clear pocket pipe in his mouth which he put away quickly." He tried to hide the pipe in his hand. The man denied he was the child's father, said the pipe was "chap stick," and quickly exited the motel room. Mother again refused to drug test, stating testing was against her religion. The social worker gave Mother a list of domestic violence shelter referrals and a referral to services. Mother did not want any of her family members

3

involved, and again denied the domestic violence allegations and refused to go to a shelter. DPSS arranged for Mother to stay another night at the motel.

The social worker made an unannounced visit to the motel on May 26, 2020. Mother again stated that there was no domestic violence between her and Father. She also said that she could not stay at the same motel another night, because the manager had accused her of stealing from other rooms. DPSS made arrangements for her to stay at a shelter, but Mother declined and asked the social worker if the worker could pay for a night at a different motel. She also refused to drug test, again asserting it was against her religion. While the social worker was at the motel, one of Mother's cousins picked her and S.P. up from the motel. The social worker spoke with the cousin who reported that Mother and S.P. could not stay in his home. Mother stated that she had another cousin that was willing to allow her to stay with them. Mother denied having any information on Father's whereabouts and reported that she had been unable to contact him.

On May 27, 2020, the social worker called Mother to inquire as to where she and S.P. were living. Mother asserted that she was staying with another cousin but was not sure where the cousin lived. She also stated that she was having a three-hour surgery that morning to have gallstones removed and that she would give the cousin's name and contact information to the social worker after the surgery. Later that day, the social worker called Mother again. Mother reported the surgery went well and that she was giving S.P. a bath. She also stated that she was too tired to give the social worker the name and contact information of the cousin. Thereafter, the social worker made an

4

unannounced visit to the cousin's home with law enforcement and placed S.P. in protective custody. Mother was arrested on an outstanding warrant for taking a vehicle without consent. A "syringe, oxygen mask, and a plastic bag of marijuana" were found in S.P.'s diaper bag. DPSS had attempted a follow-up visit where Mother had been residing, but she had moved out of the motel she was staying, and she would not answer any phone calls.

Mother has a history with child protective services. On January 7, 2020, DPSS received a general neglect referral alleging Mother had a history of multi-substance abuse. Mother admitted abusing alcohol. She also reported that she stopped using cocaine when she found out she was pregnant and that she last used marijuana three months ago. The referral was "[e]valuated out."

On February 21, 2020, DPSS received another general neglect referral alleging that Mother brought S.P. for a well-child visit and she appeared "very agitated." She also stated that she had an extensive history with methamphetamine and marijuana and claimed to be clean with the exception of still smoking marijuana. Mother reported that she was using cocaine when she gave birth to S.P. but had tested negative when she gave birth. She declined DPSS's several requests to drug test. The referral was closed as "[i]nconclusive" as Mother had moved away and DPSS could not locate her.

Mother reported that she was born in California, lived in Georgia for 17 years, and relocated with Father to California about six months ago. When she relocated, Mother left behind two children, aged 12 and 11 years old, with their father in Georgia.

On May 29, 2020, DPSS filed a petition on S.P.'s behalf pursuant to section 300, subdivisions (b) and (g). As to Mother, the petition alleged that (1) the parents engaged in domestic violence while in the presence of the child (b-1); (2) Mother had an unresolved history of abusing controlled substances; she refused to submit to drug testing; and a syringe and marijuana were found in the child's diaper bag (b-3); (3) Mother suffered from unresolved mental health issues (b-4); (4) Mother lived a transient lifestyle and lacked appropriate resources to provide for the child with a safe and stable home environment (b-5); and (5) Mother had a criminal history to include arrests and/or convictions for taking a vehicle without consent (b-6). Regarding Father, the petition alleged that (1) the parents engaged in acts of domestic violence (b-1); (2) Father abused controlled substances (b-2); and (3) Father's whereabouts were unknown and he had failed to make himself available to provide care and support for his child (g-1).

On June 1, 2020, at the detention hearing, Mother was present and was appointed counsel to represent her. Father was not present. Mother had been released from custody on May 29, 2020. Mother's attorney informed the juvenile court that she would consent to urinalysis drug testing and take a drug test on June 3, 2020. The court formally detained S.P. from parental custody and ordered DPSS to provide Mother services pending the jurisdictional/dispositional hearing. Mother was also provided with supervised visitation and ordered to drug test.

6

Father's whereabouts remained unknown to DPSS. Mother reported she had contact with Father by phone, but declined to provide the phone number to DPSS and stated that she did not know his whereabouts. DPSS attempted to locate Father and discovered that Father had been arrested for public intoxication and was in custody on May 20, 2020, but was released the same day. This was four days before the current referral was received.

Mother continued to deny the allegations in the petition. She denied ongoing domestic violence and denied S.P. was in any harm from the parents' argument. She claimed the syringe found in the diaper bag was to flush the saline through her nephrostomy bag to clean it. She reported having kidney stone medical issues for the past five years and having a nephrostomy bag as a result. She said that she was hospitalized for four days recently due to her medical condition. Mother denied having any mental health problems and was willing to participate in a mental health evaluation. She also stated that she was stable, always had a place to live, and was currently unemployed. She noted that she had been living with a male friend in a one-bedroom apartment for the past three to four weeks. Mother further reported that she had smoked marijuana since she was 14 years old and still smoked twice a week. She denied using any other drugs. Mother's June 3, 2020 urinalysis drug test was negative for all substances, except marijuana.

DPSS recommended the juvenile court find true the allegations in the petition and that Mother be provided with reunification services. Mother's case plan required her to

7

attend counseling/mental health services, a domestic violence program, parenting education classes, and substance abuse services. DPSS provided Mother with referrals on June 2, 2020. S.P. adjusted well in her caregiver's home and was thriving. Mother had regular contact with S.P. and was appropriate in visits.

On June 15, 2020, the maternal grandmother contacted DPSS to express an interest in having S.P. placed in her care. The maternal grandmother stated that she had offered to care for S.P. in the past, but Mother declined. She expressed concern about Mother's "party lifestyle." She indicated that Mother had a substance abuse history and believed Mother had worked as a prostitute. The maternal grandmother explained that Mother had been made to leave her residence in Georgia due to having different men coming in and out of the home and that she had half-nude pictures of herself on her Facebook page as a way to solicit men.

The social worker spoke with Mother on June 25, 2020. During the phone call, Mother raised her voice, used profanity, and threatened the social worker. Specifically, Mother "indicated she is from Compton and knows people, stating that if I do not give her child back to her, she will find me." The social worker attempted to deescalate the situation several times without success.

Mother did not appear for a July 7, 2020 random urinalysis drug test and declined to participate in an oral drug test on July 15, 2020. Mother stated that she did not need services. In addition, although she agreed to allow DPSS to complete a home evaluation on July 21, 2020, on July 15, 2020, she reported she was not ready for DPSS to conduct a

8

home evaluation where she was living. She, however, claimed to have provisions for S.P. She visited the child, but declined to wear a mask due to COVID-19. On June 29, 2020, Father showed up to a visit, but was turned away by the foster service agency worker who was monitoring the visit.

On August 5, 2020, Mother reported being unsure if her residence could be used for a home evaluation, because the person she lived with did not like any government agencies and she was uncertain he would allow the social worker in the home. Mother later informed DPSS that her current residence could no longer be considered for a home evaluation. DPSS provided Mother with a list of shelters that would accept children. Mother said she would enter a shelter on August 10, 2020. She later informed the social worker that she had entered a shelter, but she was not available to complete a home evaluation and would call the worker to reschedule the appointment. DPSS reported that it was unable to confirm whether Mother had a safe home environment or provisions for her child, because she had not provided a residence to complete the assessment. Mother still refused to participate in services or drug test and continued to live a transient lifestyle.

The contested jurisdictional/dispositional hearing was held on August 17, 2020. Following oral argument from the parties, the juvenile court amended allegation b-1 to conform to proof, striking "'acts of domestic violence'" from the petition and changing the allegation to "'engaged in an altercation while in the presence of the child.'" The court also struck "'unresolved'" from allegation b-3 and struck allegation b-4 relating to

9

Mother's unresolved mental health issues and allegation b-6 relating to Mother's criminal history. Thereafter, the court found true the allegations in the petition as amended. The court found S.P. came within section 300, subdivisions (b)(1) and (g) and declared S.P. a dependent of the court. The court also found S.P.'s removal from parental custody was necessary and provided Mother with reunification services. The court denied services to Father under section 361.5, subdivision (b)(1). The court ordered Mother to participate in her case plan and informed Mother that a missed drug test would be considered a positive test.

On August 24, 2020, Mother did not appear for a random drug test. She also refused to submit to an on-demand drug test on September 16, 2020.

On September 10, 2020, Mother timely appealed from the juvenile court's jurisdictional and dispositional orders.

### III

### DISCUSSION

A.    *Jurisdictional Findings*

Mother contends there was insufficient evidence to support the section 300, subdivision (b) jurisdictional findings against her. Mother does not challenge the allegations against Father.

Initially, Mother asserts the justiciability doctrine does not apply because sustaining the allegations against her subjects her to registration on the Child Abuse Central Index (CACI) under the Child Abuse and Neglect Reporting Act if not reviewed

10

by this court on appeal.  DPSS argues Mother's jurisdictional arguments are not justiciable.

## 1. Justiciability Doctrine

The juvenile court assumed jurisdiction based on findings against both Mother and Father, but Father has not appealed, and Mother does not challenge the jurisdictional findings concerning him.  Thus, DPSS contends, Mother's appeal is non-justiciable because the juvenile court would retain jurisdiction despite a favorable ruling on Mother's appeal.  (*In re Briana V.* (2015) 236 Cal.App.4th 297, 308 ["'[A] jurisdictional finding good against one parent is good against both.'"]; *In re I.A.* (2011) 201 Cal.App.4th 1484, 1492 (*I.A.*) ["an appellate court may decline to address the evidentiary support for any remaining jurisdictional findings once a single finding has been found to be supported by the evidence"].)

Under the doctrine of justiciability, courts generally do not act upon or decide moot questions or abstract propositions, nor do they issue advisory opinions.  (*I.A.*, *supra*, 201 Cal.App.4th at pp. 1490-1491.)  "An important requirement for justiciability is the availability of 'effective' relief—that is, the prospect of a remedy that can have a practical, tangible impact on the parties' conduct or legal status."  (*Id*. at p. 1490.)  "For this reason, an appellate court may decline to address the evidentiary support for any remaining jurisdictional findings once a single finding has been found to be supported by the evidence," or is unchallenged.  (*Id*. at p. 1492.)

11

On the other hand, an exception to this general rule has been recognized: "[W]e generally will exercise our discretion and reach the merits of a challenge to any jurisdictional finding when the finding (1) serves as a basis for the dispositional orders that are also challenged on appeal [citation]; (2) could be prejudicial to the appellant or could potentially impact the current or future dependency proceedings [citations]; or (3) 'could have other consequences for [the appellant], beyond jurisdiction' [citation]." (*In re Drake M.* (2012) 211 Cal.App.4th 754, 762-763 (*Drake M.*).)

Generally, to acquire jurisdiction under subdivision (b) of section 300, the juvenile court was obliged to find that the child "has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result" of specified forms of parental neglect, including substance abuse, domestic violence, and failure to protect the child. (§ 300, subd. (b).) Findings that Mother "knowingly or negligently" harmed the child or exposed her to a substantial risk of physical harm are "pernicious" and "could potentially impact the current or future dependency proceedings." (*In re M.W.* (2015) 238 Cal.App.4th 1444, 1452.) The jurisdictional findings are also the basis for the dispositional order that Mother challenges on appeal. We therefore will exercise our discretion to review the juvenile court's jurisdictional findings against Mother.

2.      Jurisdictional Findings Against Mother

"On appeal, '[a] dependency court's jurisdictional findings are reviewed under the substantial evidence test. [Citation.] Under this test, we resolve all conflicts in the evidence, and indulge all reasonable inferences that may be derived from the evidence, in

12

favor of the court's findings.' [Citation.] 'The judgment will be upheld if it is supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence.' [Citation.] Importantly, issues of credibility in this context are questions for the trier of fact. [Citation.] Substantial evidence may include inferences, so long as any such inferences are based on logic and reason and rest on the evidence. [Citation.]" (*In re Madison S.* (2017) 15 Cal.App.5th 308, 318.)

Additionally, "'[w]hen a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence.' [Citation.]" (*In re I.J.* (2013) 56 Cal.4th 766, 773-774.)

Mother asserts there was insufficient evidence to support the court's true findings as to allegations b-1 (parents engaged in an altercation while in the presence of the child), b-3 (history with substance abuse), and b-5 (living a transient lifestyle and lacking resources to provide for child). A child comes within the jurisdiction of the juvenile court pursuant to section 300, subdivision (b), if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child,

13

or the willful or negligent failure of the child's parent . . . to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left, or by the willful or negligent failure of the parent . . . to provide the child with adequate food, clothing, shelter, or medical treatment, or by the inability of the parent or guardian to provide regular care for the child due to the parent's . . . mental illness, developmental disability, or substance abuse."  (§ 300, subd. (b).)

There are three elements to the section 300, subdivision (b) jurisdictional finding: "'(1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) "serious physical harm or illness" to the minor, or a "substantial risk" of such harm or illness.' [Citation.]" (*In re Isabella F.* (2014) 226 Cal.App.4th 128, 139-140; cf. *In re R.T.* (2017) 3 Cal.5th 622, 629 (*R.T.*) [parent's neglectful conduct sufficient but not necessary to support § 300, subd. (b)(1) jurisdiction].)  "Although section 300 generally requires proof the child is subject to the defined risk of harm at the time of the jurisdiction hearing [citations], the court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child [citation].  The court may consider past events in deciding whether a child currently needs the court's protection.  [Citation.]  A parent's '"[p]ast conduct may be probative of current conditions" if there is reason to believe that the conduct will continue.' [Citations.]"  (*In re Kadence P.* (2015) 241 Cal.App.4th 1376, 1383-1384, superseded by statute on other grounds in *In re A.M.* (2020) 47 Cal.App.5th 303, 322.)

14

Mother claims the evidence fails to show S.P. was at risk due to the altercation with Father (allegation b-1), noting she acted protectively towards the child and neither she nor the child were harmed during the motel incident. The record indicates Father was observed to be "yelling loudly, using profanity and kicking the door" of the parents' motel room for about 30-45 minutes at 3:00 a.m. before Mother allowed him inside. He was drunk and caused $500 worth of damage to the room. The motel manager described Father's behavior as violent in nature and was concerned for S.P., who was four months old at the time. Mother minimized Father's actions and claimed that this was the first incident. However, the officer who arrived at the scene "expressed concerns regarding domestic violence between the parents." In addition, Mother had also previously been given resources to domestic violence shelters and had stayed in a shelter.

Furthermore, Mother had unstable housing and refused to the allow the social worker to conduct a home evaluation of her residence, despite the record showing concerns with whom Mother resided with. On one occasion, an unidentified male opened Mother's motel room door with a clear pipe in his mouth. The man denied he was Father and quickly exited the room. Mother further refused to drug test, and her past history with child protective serves indicated she had been successful in avoiding dealing with her issues by changing residences and refusing to communicate with DPSS. During DPSS's investigation of the February 2020 referral, Mother moved out of the motel she was staying in and did not answer any calls from a social worker. Mother took the same approach in the present case, with Father fleeing the scene and Mother denying any

15

issues. Mother also fled Georgia with Father about six months prior to this dependency proceeding, leaving behind her two older children.

Moreover, Mother refused to give DPSS Father's contact information, despite having contact with Father. The record indicates Mother had contact with Father as Father had attempted to contact the child at a visit supervised by a foster family services agency. A reasonable inference is that Mother was providing Father with information as to her and the child's whereabouts. Father fled the scene when law enforcement arrived and his whereabouts remained unknown throughout the dependency proceedings. Because Mother appeared to be concealing Father's whereabouts and DPSS was unable to contact Father to interview him concerning the allegations, ongoing concerns existed that placed the child at risk of harm due to the parents' altercation while in the presence of the child.

A number of courts have upheld jurisdictional findings under section 300, subdivision (b), where there was evidence that the children were exposed to domestic violence and evidence supporting an "ongoing" concern about the children's exposure to domestic violence. (See *In re T.V.* (2013) 217 Cal.App.4th 126, 134-135; *In re R.C.* (2012) 210 Cal.App.4th 930, 942.) Children can be "put in a position of physical danger from [spousal] violence" because, "for example, they could wander into the room where it was occurring and be accidentally hit by a thrown object, by a fist, arm, foot or leg . . . ." (*In re Heather A.* (1996) 52 Cal.App.4th 183, 194, disapproved on other

16

grounds in *R.T.*, *supra*, 3 Cal.5th at p. 628.) We find substantial evidence here supports the court's true finding as to allegation b-1.

We now turn to the court's true finding as to allegation b-3. Mother asserts there was no evidence that she had a history of abusing controlled substances or evidence to show a nexus between her marijuana use and any risk to S.P. We disagree.

Mother repeatedly declined to drug test as being against her religion. She later drug tested, but had chosen both the method of testing, urinalysis, and the date of testing of June 3, 2020. DPSS had requested Mother to drug test on other days, but she repeatedly refused. Following the August 17, 2020 jurisdictional hearing, the juvenile court ordered Mother to drug test and she again refused to test. While Mother disputed the claim that she was using drugs, with the exception of marijuana, and asserted that she had not used prior to S.P.'s birth (approximately for four to five months), the juvenile court was free to disbelieve her, especially since she refused each on-demand request to drug test, which the court could properly consider the "equivalent of a positive test result." (*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1217 (*Christopher R.*).)

The record indicates Mother had a history of abusing drugs. On May 24, 2020, Mother admitted that she smoked marijuana and drank alcohol sometimes but denied the use of any other substances. However, law enforcement observed Mother with marks on her arm that indicated drug use on this same day. On February 21, 2020, Mother reported an extensive history with methamphetamine and marijuana. She stated that she had smoked marijuana since she was 14 years old and admitted that she was using cocaine

17

when she gave birth to S.P.  The maternal grandmother reported that Mother had a substance abuse history and believed Mother had worked as a prostitute.

Moreover, on the day S.P. was taken into protective custody, a syringe and a baggie of marijuana was found in the child's diaper bag.  Although Mother later claimed the syringe was to flush saline through her nephrostomy bag to clean it, a reasonable inference can be made that the syringe could also be used to administer drugs.  Mother provided no documentation concerning her medical condition.  The court could have disbelieved Mother's explanation, especially because Mother repeatedly refused to drug test and admitted using drugs up until S.P. was born, which was only four months before the child was detained.  (See *Christopher R.*, *supra*, 225 Cal.App.4th at pp. 1218-1219 [the court upheld the jurisdictional finding that the father's daily marijuana use posed a substantial risk of harm to his three-month-old daughter].)

Regarding causation and harm or substantial risk of harm due to Mother's substance abuse, when children are very young, "'the absence of adequate supervision and care poses an inherent risk to their physical health and safety.'"  (*Christopher R.*, *supra*, 225 Cal.App.4th at p. 1220.)  In other words, "the finding of substance abuse is prima facie evidence of the inability of a parent or guardian to provide regular care resulting in a substantial risk of physical harm."  (*Drake M*., *supra*, 211 Cal.App.4th at p. 767; see *Christopher R*., at p. 1220.)  Here, S.P. was four months old when she was detained and approximately seven months old at the time of the jurisdictional hearing.

The Legislature has recognized that, in general, substance abuse has a negative effect on the home environment and the safety of children living in that environment. (§ 300.2 ["The provision of a home environment free from the negative effects of substance abuse is a necessary condition for the safety, protection and physical and emotional well-being of the child."].)  When a parent's substance abuse problem amounts to a lifestyle problem, the home environment usually is permeated with the negative effects of drug abuse.  A parent's drug-centered lifestyle may be found to expose a child to substantial risks, i.e., the risk of seriously compromising the child's physical and emotional well-being and the risk that the child will ingest drugs.  (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 825-826.)  Using drugs while responsible for a child's welfare and leaving drugs within a child's reach simply are not "parental acts."  (*In re Leticia S.* (2001) 92 Cal.App.4th 378, 382.)  Substantial evidence supports the juvenile court's finding that there was a substantial risk S.P. would suffer serious physical harm or neglect by virtue of Mother's substance abuse and its impact on her ability to supervise and care for her daughter.  (*In re Brison C.* (2000) 81 Cal.App.4th 1373, 1378-1379.)

Mother also asserts that allegation b-5 is not supported by substantial evidence. She argues there was no nexus between her lifestyle and any harm or risk or harm to S.P. As found true by the juvenile court, allegation b-5 states:  "The mother lives a transient lifestyle, and lacks appropriate resources to provide the child with a safe and stable home environment."

Although Mother correctly notes poverty alone is not a valid basis for asserting jurisdiction, this case involves more than poverty. Substantial evidence shows that Mother failed to provide S.P. with a safe and stable home environment. From May 24, 2020 to the August 17, 2020 jurisdictional hearing, it appears Mother resided in five different locations. Mother consistently refused referrals to shelters where she could reside with a child. She also refused family support and declined referrals to other services. She further refused to allow DPSS to evaluate her residence on several occasions. An inference can be made that she refused home evaluations because she was residing with Father. Without this evaluation, DPSS was unable to ascertain whether Mother could provide S.P. with a stable and safe home environment.

Further, Mother was asked to leave the second motel because she was accused of stealing items from other rooms. She was also arrested on May 27, 2020, on a warrant for taking a vehicle without consent. And she left her elder two children in Georgia to come to California. Mother's transient lifestyle was not based on poverty, but a choice she made. She chose not to receive any assistance from her family. She also declined DPSS's numerous referrals to obtain a stable residence for herself and S.P. Substantial evidence supports the court's finding of jurisdiction based on allegation b-5.

Mother's substance abuse issues, her transient lifestyle, altercation with Father, and her refusal to cooperate with DPSS support the jurisdictional findings.

B.    *Dispositional Findings*

Mother also contends there was insufficient evidence to support removing S.P. from her custody and that there existed reasonable means to prevent removal of S.P. from her care.  We disagree.

"A dependent child shall not be taken from the physical custody of his or her parents . . . with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence . . . .  [¶] (1) [That] [t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . ."  (§ 361, subd. (c)(1).)

"Because we so abhor the involuntary separation of parent and child, the state may disturb an existing parent-child relationship only for strong reasons and subject to careful procedures."  (*In re Kieshia E.* (1993) 6 Cal.4th 68, 76.)  California law therefore "requires that there be no lesser alternative before a child may be removed from the home of his or her parent."  (*In re Jasmine G.* (2000) 82 Cal.App.4th 282, 284; § 361, subd. (c)(1).)  But, "'"[t]he parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate.  The focus of the statute is on averting harm to the child."  [Citation.]  The court may consider a parent's past conduct as well as present circumstances.  [Citation.]'"  (*In re John M.* (2012) 212 Cal.App.4th 1117, 1126.)

21

We review a juvenile court's dispositional order removing a child from parental custody for substantial evidence, "'"bearing in mind the heightened burden of proof."'" (*In re Hailey T.* (2012) 212 Cal.App.4th 139, 146.) "Clear and convincing evidence requires a high probability, such that the evidence is so clear as to leave no substantial doubt." (*In re Isayah C.* (2004) 118 Cal.App.4th 684, 695.) Still, the appellant bears the burden of showing "'there is no evidence of a sufficiently substantial nature'" to support the dispositional removal order. (*In re D.C.* (2015) 243 Cal.App.4th 41, 55, superseded by statute on other grounds in *In re A.M.*, *supra*, 47 Cal.App.5th at p. 322.)

Here, substantial evidence—evidence so clear as to leave no substantial doubt—shows that removing S.P.'s from Mother's custody was necessary to protect S.P.'s physical and emotional well-being, and there were no other reasonable means by which S.P.'s well-being could be protected without removing her from Mother's custody. (§ 361, subd. (c)(1).) Substantial evidence shows that, by the time of the August 17, 2020 dispositional hearing, Mother had repeatedly refused to drug test, failed to provide Father's contact information to DPSS, continued to deny domestic violence issues with Father, refused to enter a shelter, declined DPSS's repeated requests to conduct an evaluation of Mother's residence, had recently been arrested for a serious crime, and was not fully cooperating with DPSS or fully participating in her services. Mother had also changed her residence approximately five times in a four-month period and had recently left her two elder children in Georgia. Mother had no adequate support and refused assistance from her family. Given that Mother did not have an adequate support system

22

or "safety network" to care for S.P., S.P. was at a substantial risk of serious physical harm if returned to Mother's care. Thus, Mother's ability and willingness to properly care for S.P. was in serious question by the time of the dispositional hearing.

Mother claims there were less drastic alternatives to removing S.P. from her care, including placing S.P. with Mother at a shelter pursuant to a family maintenance plan. We disagree. Mother declined DPSS's repeated requests to enter a shelter and was evasive concerning Father's whereabouts. She also refused DPSS's requests to evaluate her residence for potential placement of S.P. in her home, and also declined any assistance from her family. The record also shows that Mother had previously avoided contact with DPSS and moved from motel to motel, as well as from Georgia to California six months before S.P. was detained. In sum, it was necessary to remove S.P. from Mother's custody, as there were no less drastic alternatives to removing S.P. from Mother's custody.

IV

DISPOSITION

The juvenile court's jurisdictional and dispositional orders are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

<u>CODRINGTON</u>
J.

We concur:

<u>McKINSTER</u>
Acting P. J.

<u>FIELDS</u>
J.

23